**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KECK GARRETT & ASSOCIATES, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 05 C 3265 |
| | ) |
| NEXTEL COMMUNICATIONS, INC., | )  Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Keck Garrett & Associates, Inc. ("KGA") is an Illinois corporation in the business of marketing communications and providing branding strategies to businesses. From 1997 to 2003, KGA provided product packaging and related services to Defendant, Nextel Communications, Inc. ("Nextel"). Nextel is a Delaware Corporation that, through its wholly-owned subsidiaries, provides fully integrated wireless communication services. In January of 2003, Nextel issued a Blanket Purchase Order ("2003 BPO") to KGA in the amount of $1 million dollars for packaging work Nextel anticipated that KGA would perform in 2003. In this same year, Nextel began working with an advertising agency that offered to perform its packaging work, and Nextel terminated its relationship with KGA. KGA characterizes this termination as a breach of contract and now sues Nextel to recover money that KGA claims it is owed under the 2003 BPO.[1] Both parties have moved for summary judgment on KGA's breach of contract claim. For reasons explained below, the court grants Nextel's motion for summary judgment and denies KGA's motion for summary judgment.

**FACTUAL BACKGROUND**[2]

---

[1] KGA's complaint also included a count of quantum meruit. In its motion for summary judgment, KGA abandons its quantum meruit claim, thus the court does not address it here. (*See* Pl. Mem. at 2, 9.) KGA also filed a motion seeking leave to amend its complaint in order to add additional tort and quasi contract theories, (*see id.* at n.1), however, KGA has since elected to stand upon its original complaint. (9/13/06, Election to Stand Upon Complaint.)

[2] The court derives the factual background from Plaintiff's Rule 56 Statement of Facts
(continued...)

## A. Initial Communications Regarding The Falcon Project

In 2002, KGA worked on the packaging for what Nextel referred to internally as the "Condor project." (KGA LR 56.1 Stmt. ¶ 5; Nextel LR 56.1 Stmt. ¶ 31.) The focus of the Condor project was to develop an industrial design and a creative design to support the launch of a new platform of wireless devices developed by Motorola. (Nextel LR 56.1 Stmt. ¶ 32.)[3] In the fall of 2002, Nextel began working on the Falcon project. (*Id.* ¶ 54.) It is work that KGA claims to have done on the Falcon project that gives rise to this dispute.

In 2002 and 2003, Brian Lausch was the Manager of Product Packaging for Nextel and was principally responsible for managing Nextel's relationship with KGA. (*Id.* ¶ 19.) In late 2002, Lausch met with Cheryl Garrett, a principal and founder of KGA, (*id.* ¶ 8), Brandi Bialas, then the account executive at KGA assigned to the Nextel account, (*id.* ¶ 10),[4] Lynn Kupczyk, then the primary designer at KGA responsible for working with Nextel, (*id.* ¶ 15), and a representative of Motorola, the company that designs and manufactures phones that utilize Nextel's wireless

---

[2](...continued)
in Support of Plaintiff's Motion for Summary Judgment ("KGA LR 56.1 Stmt."), Nextel Communications, Inc.'s Response to Plaintiff's Rule 56 Statement of Facts ("Nextel LR 56.1 Resp."), Nextel's Statement of Uncontested Facts ("Nextel LR 56.1 Stmt."), and Keck Garrett & Associates, Inc.'s Response to Nextel's Statement of Uncontested Facts ("KGA LR 56.1 Resp.")

[3]     Developing the "industrial design" of a package involves coming up with the structure of the package; developing the "creative design" concerns the design that goes on the package. (*See* Lausch Dep. at 84, 106-09, Ex B. to Nextel LR 56.1 Stmt.)

[4]     The parties discuss the scope of Bialas' duties at length. Nextel claims that Lausch would describe projects to Bialas, who would prepare an estimate of the cost of KGA's work and send it to Lausch for approval. (*See* Nextel LR 56.1 Stmt. ¶¶ 43-48.) KGA claims that Garrett developed the estimate or instructed Bialas as to how to determine the estimate, and that Garrett was responsible for approving the estimate, though KGA admits that sometimes Bialas engaged in the ministerial task of preparing the estimate and forwarding it to Nextel for approval. (*See* KGA LR 56.1 Resp. ¶¶ 43-48.) In the court's view, these descriptions of Bialas' duties are not at odds; to the extent there is a dispute, it is not material to the disposition of this motion.

communication services.  (*Id.* ¶ 57; Nextel LR 56.1 Resp. ¶ 6.)  This meeting was a "press check"[5] related to the Condor project.  (Nextel LR 56.1 Stmt. ¶ 58.)  KGA and Nextel agree that there was a conversation at the press check about "potential upcoming projects," (KGA LR 56.1 Resp. ¶ 60), and that KGA first learned of the forthcoming Falcon project at the press check.  (KGA LR 56.1 Stmt. ¶ 6; Nextel LR 56.1 Resp. ¶ 51.)

According to Garrett's account, Lausch told KGA that the Falcon project would be big and that KGA would have to "gear up for it and get ready . . . to do it."  (KGA LR 56.1 Stmt. ¶¶ 51-52; Garrett Dep. at 70, Ex A. to Nextel LR 56.1 Stmt.)[6]  As a result, Garrett felt that she needed to have staff available for the project, it is undisputed, however, that Lausch herself did not tell Garrett to hire additional staff.  (Nextel LR 56.1 Resp. ¶ 55.)  Garrett also testified that Lausch told her that the Falcon project would be similar to KGA's past work for Nextel in that it would be a new packaging initiative and would involve many phones, but that none of the graphics used for prior phone lines would be used, and KGA would instead be starting anew.  (KGA LR 56.1 Stmt. ¶ 60.)  Based on the amount that KGA had billed Nextel for its work in previous years, Garrett expected that KGA would bill Nextel approximately $1 million for the Falcon project.  (*Id.* ¶ 53; Garrett Dep. at 80-81.).  The parties agree, however, that there was no discussion at the press check of the scope of work on the Falcon project, how much money KGA would be paid for work, or the terms of payment.  (KGA LR 56.1 Stmt. ¶ 51; Nextel LR 56.1 Stmt. ¶ 61.)

---

[5]     At a press check, Nextel meets with the appropriate stakeholders and the printer to "review and approve packaging sheets" before they go into full-scale production.  (Lausch Dep. at 34-35.)

[6]     Nextel denies this fact, citing Lausch's testimony that he would not have shared a great deal of information in the presence of those at the press check and Garrett's testimony admitting that the initial conversation about the Falcon project was of a general nature.  (Nextel LR 56.1 Resp. ¶ 51).  The fact that details concerning the Falcon project may not have been known or shared at the time of the press check does not preclude a finding that Lausch informed KGA that the project was big or that KGA would have to get ready for it, which, in the court's view, remains undisputed.

Citing Garrett's testimony about KGA's conversation with Lausch at the 2002 press check, KGA also asserts that it was "told that it would definitely be getting the Falcon project," and that the parties entered into an oral agreement under which KGA "would do what was asked of it, and deliver the project on time." (KGA LR 56.1 Stmt. ¶¶ 50, 54; Garrett Dep. at 86.) According to KGA, this agreement was later supported by the 2003 BPO. (KGA LR 56.1 Stmt. ¶ 50.) Nextel denies that it promised KGA work on the Falcon project or that any such oral agreement existed and cites the testimony of former KGA employees who did not share Garrett's understanding. (Nextel LR 56.1 Resp. ¶¶ 50, 54.) For example, the affidavits of Kupczyk and Bialas, both of whom were present at the press check on behalf of KGA, state that they were not aware of Nextel promising KGA any work or a particular amount of work on the "Falcon project." (Bialas Aff. ¶ 12, Ex. C to Nextel LR 56.1 Stmt.; Kupczyk Aff. ¶ 12, Ex. D. to Nextel LR 56.1 Stmt.)[7]

Nextel also denies that the Falcon project actually became the subject of an assignment to KGA in 2003. (Nextel LR 56.1 Resp. ¶ 5.) Both Nextel and KGA cite testimony of Brian Lausch, a Nextel employee, to support their positions on this issue. Lausch testified as to what the Falcon project was and the fact that the project was discussed with KGA, but did not testify that the Falcon project was the subject of an assignment to KGA in 2003. (Lausch Dep. at 26.) KGA also cites to

---

[7]     KGA challenges Nextel's use of affidavits that it obtained from Bialas and Kupczyk, former Nextel employees. (KGA Opp'n at 7-10.) KGA cites to *Orlowski v. Dominick's Finer Foods, Inc.*, 937 F. Supp. 723 (N.D. Ill. 1996), for the proposition that testimony by former employees cannot bind KGA. (KGA Opp'n at 7-8.) *Orlowski* is clear that the testimony of former employees cannot bind a former employer, but *Orlowski* also confirms that former employees may "freely engage in communications" with opposing counsel as long as they do not divulge privileged information. 937 F. Supp at 728. KGA is therefore correct that the statements of Bialas and Kupczyk are not binding on KGA, however, Nextel is not precluded from using their sworn statements as evidence. KGA also claims that the facts attested to by these employees are "wrong, irrelevant, and speculative." (KGA Opp'n at 9-10.) In relevant part, Bialas and Kupczyk have attested, based on their firsthand knowledge, to communications or meetings between Nextel and KGA and their impressions of these communications or meetings. Such testimony is neither irrelevant nor speculative. As for the accuracy of facts to which Bialas and Kupczyk have attested, Local Rule 56.1 gives KGA the opportunity to present evidence to dispute testimony that it claims is inaccurate.

a document entitled "Falcon Packaging Requirements," a document setting forth details about the Falcon project, sent to KGA in confidence. (Exs. to KGA LR 56.1 Stmt. at 94.) That document does not mention an assignment to KGA, however, nor does the e-mail message to which it was attached reflect an assignment to KGA of work on the Falcon project. (*See* Nextel LR 56.1 Resp. ¶¶ 8-9; 1/9/03 E-mail, Ex. H to Nextel LR 56.1 Resp.) ("It will be several weeks before an industrial design direction is formulated with Motorola. Until then, we will not know the scope of our creative design needs. At that time, we will prepare a creative brief to share with KGA.") The evidence does not support KGA's claim that Nextel assigned KGA to work on the Falcon project in 2003.

On January 8, 2003, Bialas sent Lausch an e-mail requesting further information about "the branding initiative" and asking if there was room in the budget for KGA to contribute ideas regarding structural packaging for "the new phones"; the e-mail message acknowledges that Nextel was already working with Frog Design on the structural packaging. (KGA LR 56.1 Stmt. ¶ 7; Nextel LR 56.1 Stmt. ¶ 68; 1/8/03 E-mail, Ex. H to Nextel LR 56.1 Resp.)[8] Lausch responded on January 9, 2003, suggesting a conference call to "walk [KGA] through" Nextel's 2003 brand strategy. (1/9/03 E-mail.) In this e-mail, Lausch also attached the "Falcon Packaging Requirements" document, informed KGA that Nextel did not yet know of its creative design needs and would prepare a creative brief to share with KGA "at that time," and stated that "since Motorola engaged Frog Design[,] Nextel did not set aside any industrial development funds for 2003." (Nextel LR 56.1 Resp. ¶ 7; 1/9/03 E-mail.) Nextel nevertheless admits that Lausch anticipated that KGA would do packaging work on the Falcon project "absent any significant change in events," and that, as a result, Nextel planned to prepare a "creative brief" that KGA could review and advise Nextel of what work would be required and what it would cost. (Nextel LR 56.1 Resp. ¶ 10; Lausch Dep. at 45-46.)

---

[8] Motorola contracted with Frog Design to develop the packaging to support the Falcon product line. (Lausch Dep. at 84.) Frog Design's role was to develop the structure of the package. (KGA LR 56.1 Stmt. ¶ 65; Lausch Dep. at 109.)

Lausch and his supervisor, Jim Obermeyer, who was then the Director of Brand Advertising and Marketing for Nextel and responsible for product packaging, (Nextel LR 56.1 Stmt. ¶ 21; KGA LR 56.1 Stmt. ¶ 34), had a conference call with individuals from KGA (unidentified in the record) on January 23, 2003. In that call, Lausch and Obermeyer shared with KGA a PowerPoint presentation created by Mullen, Nextel's national advertising agency, to keep KGA informed of Nextel's plans for its brand. (Nextel LR 56.1 Stmt. ¶ 71; Nextel LR 56.1 Resp. ¶ 13.) Lausch acknowledged that he did not make a similar presentation to any other advertising agency, but Lausch's primary agency contact was with KGA; he noted that others at Nextel may have conducted presentations to other agency partners. (Nextel LR 56.1 Resp. ¶ 13; Lausch Dep. at 58, 133-34.) Indeed, it was not unusual for Nextel to make sure that its marketing partners were well-informed about its brand strategy, regardless of whether Nextel and the vendor were engaged in ongoing or upcoming projects. (Nextel LR 56.1 Stmt. ¶ 76.)

### C.     Purchase Orders

#### 1.     Nextel's Use of Purchase Orders Generally

According to Obermeyer, Nextel issues written purchase orders to all of the agencies that provide services for Nextel. (KGA LR 56.1 Stmt. ¶ 35.)[9] In 2002 and prior years, Nextel issued purchase orders to KGA; each purchase order incorporated Nextel's Purchase Order Terms and Conditions. (Nextel LR 56.1 Stmt. ¶¶ 33, 35.) Some of the purchase orders issued to KGA were blanket purchase orders while others were orders for particular projects. (*Id.* ¶ 34, Purchase Orders, Ex. G to Nextel LR 56.1 Stmt.) Nextel issues blanket purchase orders, based on budgeted amounts, to expedite payment to vendors by eliminating the need to issue a separate purchase

---

[9]     Nextel admits only that it was "Obermeyer's experience" that Nextel issued written purchase orders for all of its agencies; Obermeyer's testimony is not so qualified, however. (Nextel LR 56.1 Resp. ¶ 35; Obermeyer Dep. at 13, Ex. E to Nextel LR 56.1 Stmt.)

order for every project a vendor is asked to complete or each time an estimate for work is submitted and approved. (Nextel LR 56.1 Stmt. ¶¶ 37, 39-40.)[10] Blanket purchase orders do not describe any particular work or project but document the agreement between the parties regarding the terms and conditions governing any work that the vendor is asked to complete under the order. (*Id.* ¶ 38.)[11]

Under Nextel's policy, in order for a vendor's invoice to be approved, the vendor's work must "be authorized by a pre-approved estimate of cost." (*Id.* ¶ 41.) Citing Bialas's affidavit, Nextel claims that KGA was, generally speaking, aware of Nextel's policy requiring a pre-approved estimate of cost, (*id.* ¶ 42; Bialas Aff.¶¶ 8, 13),[12] and usually began work only after Nextel approved of the estimate. (Nextel LR 56.1 Stmt. ¶ 51.) "KGA understood that Nextel would only pay for work that Nextel had approved, based on a signed estimate, in accordance with the procedure requested and explained to KGA by Nextel." (*Id.* ¶¶ 53, 95.)[13] When KGA was in the midst of a hectic project,

---

[10]     KGA denies that it was aware of Nextel's purpose for issuing blanket purchase orders. (KGA LR 56.1 Resp. ¶ 37.) In this instance and numerous others, KGA denies awareness of an assertion Nextel makes in its LR 56.1 Statement but cites no specific evidence to contradict Nextel's assertion, which is insufficient to establish a dispute of fact. (*See e.g.*, *id.* ¶¶ 39-41, 90-92.)

[11]     KGA denies Nextel's statement describing blanket purchase orders based on testimony that KGA personnel understood the 2003 BPO to refer to the Falcon project. (*Id.* ¶ 38.) This evidence does not contradict that blanket purchase orders do not describe a particular project and does not create a dispute of fact, particularly given that invoices for work that KGA admits were unrelated to the Falcon project were submitted pursuant to the 2003 BPO. (*See* 2003 Invoices, Ex. W to Nextel LR 56.1 Stmt.; *see also infra* n.20 (discussing 2003 invoices).)

[12]     KGA denies that it was aware of Nextel's policy for invoice approval and contends that "the true facts are set forth in Cheryl Garrett's deposition and her affidavit." (KGA LR 56.1 Resp. ¶ 42.) KGA has not established a dispute of fact. While Garrett's affidavit states Nextel "did not communicate its internal budgeting and payment procedures which now appear to be the focus of its defense," (Garrett Aff. ¶ 3, Ex. to KGA LR 56.1 Resp.), Garrett also testified that KGA generally submitted an estimate before an invoice. (Garrett Dep. at 30.) KGA does state in its "Additional Response to Nextel's Rule 56 Statement" that "[o]utside of the Purchase Order number being required on an invoice, KGA was unaware of Nextel's internal budgeting/payment procedures," but the estimate and approval process that KGA admits it previously engaged in with Nextel are not *internal* procedures. (KGA Add'l Resp. to Nextel LR 56.1 Stmt. ¶ 2.)

[13]     KGA denies this fact, but as explained earlier, *supra* note 12, the court deems it admitted. KGA cites only Garrett's affidavit in which Garrett states that Nextel did not communicate
(continued...)

however, KGA might continue to do certain work for Nextel even though it had not received the signed estimate from Lausch.  (*Id.* ¶ 52.)

### 2.    January 23, 2003 Purchase Order

The parties agree that on January 23, 2003, Nextel issued the 2003 BPO to KGA for $1 million dollars.  (1/23/03 BPO, Ex. L. to Nextel LR 56.1 Stmt.)  The 2003 BPO stated that it was a "Blanket Order for 2003 Phone & Accessory Packaging" and listed Vicki Hall, a financial analyst in Nextel's finance department, and Lausch as the Nextel employees authorized to release funds against the 2003 BPO.  (*Id.*; Nextel LR 56.1 Stmt. ¶¶ 24-26.)  Hall forwarded the 2003 BPO to Bialas via e-mail, informing KGA of its purchase order number for 2003.  (Nextel LR 56.1 Stmt. ¶ 84.)  The 2003 BPO listed December 31, 2003, as the "delivery date" for "2003 Blanket for Phone & Accessory Packaging"; phone and accessory packaging is the work that KGA had performed for Nextel in the past.  (1/23/03 BPO; KGA LR 56.1 Stmt. ¶ 56.)  According to Garrett, KGA's understanding of the purchase order was that KGA was entitled to the $1 million balance of the 2003 BPO, regardless of whether KGA submitted $1 million worth of invoices to Nextel.  (KGA LR 56.1 Stmt. ¶ 59; Garret Dep. at 109, 114-15.)

The 2003 BPO incorporates by reference the terms and conditions attached to it.  (KGA LR 56.1 Stmt. ¶ 32.)  At the outset, the 2003 BPO states that the purchase order "together with any exhibits, schedules or other documents attached . . . integrates, merges, and supersedes all prior offers, negotiations, agreements, or understandings concerning the subject matter hereof and constitutes the entire agreement between the parties."  (1/23/03 BPO.)  Among the other incorporated terms and conditions is a provision governing "payments and invoices," which states that the "Supplier shall be paid upon the submission of proper invoices or vouchers, the prices

---

[13](...continued)
"its internal budgeting and payment procedures;" she does not address KGA's understanding concerning Nextel's estimate and approval process.

stipulated herein for work completed and/or Articles delivered and accepted,[14] less any proper deductions or setoffs." (*Id.*)[15] The same provision also specifies that invoices submitted must contain the "Purchase Order number, item number, description of Articles or work, sizes, quantities, unit prices, and extended totals." (*Id.*) The 2003 BPO also states that "[t]he Purchasing Agent"[16] may at any time, by a written order, make changes, within the general scope of this Purchase Order, in any one or more of the following . . . [d]escription of services to be performed . . . [t]ime of performance of services . . . ." (*Id.*) Changes that cause an increase or decrease in the cost or time required for performance of work under the BPO require an equitable adjustment to the price and/or delivery schedule and modification of the BPO. (*Id.*) The 2003 BPO includes a term stating that any "waiver, alteration, or modification of any of the provisions of the [the] Purchase Order" is not binding on Nextel "unless evidenced by a written notice or amendment signed by the Purchasing Agent. . . . " (*Id.*) The 2003 BPO further provides that no terms and conditions except those set forth in the 2003 BPO (and incorporated documents) bind Nextel unless accepted by Nextel in writing. (*Id.*) Finally, the 2003 BPO is explicit that it is governed by and subject to Delaware law, and that in the event that Nextel defends any action brought by the supplier and prevails in its defense, "the Supplier shall pay court costs and reasonable attorneys' fees incurred by Nextel." (*Id.*)

Lausch admitted that he had not read the terms and conditions of the 2003 BPO when it was

---

[14] "Articles" are "goods, products, services or other items constituting the subject matter of this Purchase Order, which are to be furnished by the Supplier to Nextel hereunder." (1/23/03 BPO.)

[15] The "Supplier" is the "individual, partnership, corporation, or association contracting to perform the work or supply or provide the Articles hereunder." (*Id.*)

[16] "Purchasing Agent" means any individual employed by Nextel who is duly authorized by Nextel to purchase or contract for articles. (*Id.*)

9

issued on January 23, 2003. (Lausch Dep. at 66.)[17] Similarly, Obermeyer admitted that he was familiar with the 2003 BPO terms but had not read the terms and conditions in their entirety and that he did not believe that the 2003 BPO constituted a binding written contract. (KGA LR 56.1 Stmt. ¶¶ 37, 46; Obermeyer Dep. at 16, 51-52, Ex. E to Nextel LR 56.1 Stmt.) In 2003, Obermeyer only had the authority to approve purchase orders of $125,000 or less; a $1 million dollar agreement would have required approval by someone higher in rank than Obermeyer and his boss, Mary Matthews. (KGA LR 56.1 Stmt. ¶¶ 34, 36.) Garrett believes that Matthews is, in fact, the person that directed Nextel to issue the 2003 BPO to KGA. (*Id.* ¶ 49.)

Nextel asserts that the 2003 BPO controls the relationship between KGA and Nextel, and that Nextel created the 2003 BPO in connection with Nextel's budgeting process for 2003 based on Lausch's estimate that Nextel would spend $1 million on packaging with KGA in 2003. (Nextel LR 56.1 Stmt. ¶¶ 90-92; Nextel LR 56.1 Resp. ¶ 19.) The parties agree that when KGA received the 2003 BPO it did not know the structure of the package on which it would be placing its creative design or what phone would be in the structure, (Nextel LR 56.1 Resp ¶ 58); KGA contends, in addition, that KGA knew what it would be doing when it received the 2003 BPO. This fact is not disputed; testimony that the packaging structure was still uncertain, cited by Nextel, does not contradict Garrett's insistence that KGA was aware that it would be designing packaging for Nextel. (*See* Garrett Dep. at 105.)

A dispute does appear to exist, however, as to whether the 2003 BPO was a commitment or guarantee to assign to KGA any particular work or any particular amount of work in 2003. (Nextel LR 56.1 Stmt. ¶ 93.) KGA insists that the order relates to the Falcon project; KGA notes that the order came in the aftermath of discussions about the Falcon project, (KGA LR 56.1 Stmt.

---

[17]     Nextel denies that Lausch never fully read the 2003 BPO, contending that the testimony to which KGA cites does not support the assertion. (Nextel LR 56.1 Resp. ¶ 19.) While KGA cited to a portion of Lausch's deposition in error, other portions of Lausch's deposition do support KGA's assertion. (*See* Lausch Dep. at 66.)

¶ 56, Garrett Dep. at 102-03), and cites Garrett's statement that KGA considered the 2003 BPO to be a binding contract for $1 million. (KGA LR 56.1 Resp. ¶ 93; Garrett Aff. ¶ 56.) Nextel, on the other hand, cites testimony supporting that the BPO was not a commitment for certain work and points to the 2003 BPO, which does not reference the Falcon project on its face. (Nextel LR 56.1 Stmt. ¶ 90; 1/23/03 BPO.)

D.     **Post-January 23, 2003 Communications**

Throughout January 2003, Lausch continued to expect that, absent any significant changes, Nextel would be working with KGA on the Falcon project. (Nextel LR 56.1 Resp. ¶ 17.) On January 24, 2003, one day after Nextel issued the 2003 BPO to KGA, Lausch sent Bialas an e-mail, with copies to Garrett and Obermeyer, attaching five documents related to Falcon packaging. (KGA LR 56.1 Stmt. ¶ 15.) Among these documents was the "Nextel Falcon Packaging Concept Timeline," a document that was prepared by Lausch and marked "Nextel Confidential and Proprietary"; in his accompanying e-mail, Lausch asked Bialas to review this document "first." (*Id.* ¶¶ 15-16; 1/24/03 E-mail, Ex. J to Nextel LR 56.1 Stmt.; Packaging Timeline, Ex. K. To Nextel LR 56.1 Stmt.) This document included information on the potential packaging structures that Nextel was still considering as of January 17, 2003. (Nextel LR 56.1 Stmt. ¶¶ 78-81.) From this e-mail and the attachments, KGA was aware that there were disagreements between Nextel and Motorola over design concept, that Frog Design was still working on the structure of the packaging, and that Nextel did not have funds to engage KGA in structural design work. (*Id.* ¶ 82.) Lausch testified that he, indeed, would have considered it a breach of trust if KGA had shared the documents he provided to a telecommunications company with which KGA was also working. (KGA LR 56.1 Stmt. ¶ 18; Lausch Dep. at 77-78.)

On February 12, 2003, Lausch sent another e-mail to Bialas, with copies to Garrett and Obermeyer, providing additional information about the Falcon project and requesting that KGA treat the information as "highly confidential." (KGA LR 56.1 Stmt. ¶ 20.) In this e-mail, Lausch informed

Bialas that creative requirements for the Falcon project remained "TBD." (Nextel LR 56.1 Stmt. ¶ 96.) Even as of February 12, 2003, Lausch continued to believe that, absent significant change, KGA would develop the creative design that would go in the structural packaging for the Falcon project. (Nextel LR 56.1 Resp. ¶ 21.) Nextel further admits that, as of this date, Lausch believed that Nextel would need KGA's creative work on the structural packaging for one particular phone model by July 31, 2003 and at the end of August, September, and October for three other Falcon phone models. (*Id.*)

On February 21, 2003, Garrett sent an e-mail to Lausch inquiring about the progress of the "packaging structure" and asking when KGA "may need to start concepting." (KGA LR 56.1 Stmt. ¶ 22; 2/21/03 E-mail, Ex. O to Nextel's LR 56.1 Stmt.) In her e-mail, Garrett explained that she was trying to plan in advance for scheduling purposes. (KGA LR 56.1 Stmt. ¶ 22; 1/21/03 E-mail.) Lausch responded to Garrett on February 24, 2003 that he and Obermeyer had begun discussing Nextel's creative needs and planned to prepare a formal Falcon creative brief in the coming weeks. (KGA LR 56.1 Stmt. ¶ 23; Nextel LR 56.1 Stmt. ¶ 98; 2/24/03 E-mail, Ex. O to Nextel's LR 56.1 Stmt.) Nextel admits that Lausch continued to expect that Nextel would work with KGA on the Falcon project as of this date. (Nextel LR 56.1 Resp. ¶ 25.) Nextel also admits that Obermeyer believed that, barring any significant change, Nextel would work with KGA on the Falcon project. (*Id.* ¶ 37.)

In an e-mail dated March 14, 2003, Lausch shared with KGA Nextel's preferred industrial design for Falcon packaging and confirmed that the creative brief was "nearly complete" and that he hoped to share it with KGA in the first week of April. (KGA LR 56.1 Stmt. ¶ 26; 3/14/03 E-mail, Ex. P to Nextel LR 56.1 Stmt.) Bialas responded to Lausch on March 17, 2003, stating "Cher [Garrett] and I will get the team together and begin brainstorming once we receive the creative brief." (KGA LR 56.1 Stmt. ¶ 27; 3/17/03 E-mail, Ex. Q to Nextel LR 56.1 Stmt.) Lausch sent another e-mail to Bialas on April 17, 2001, asking her to consider "the current Nextel color palette

and design guide." (KGA LR 56.1 Stmt. ¶ 28.)

KGA claims that it started working on the Falcon project in early 2003 by conducting preliminary market research and other research to get ready for the initiative. (*Id.* ¶ 66.)[18] KGA found this work necessary because, to Garrett's knowledge, the packaging initiative was to come any day, and Nextel's delivery date generally did not move. (*Id.*) Nextel admits that its delivery date generally did not move, but denies that KGA did any packaging work on the Falcon project in response to a request from Nextel. (Nextel LR 56.1 Resp. ¶ 66.) Nextel notes that KGA sent an e-mail as late as May 6, 2003 asking when Nextel might release the project so that KGA could "get started." (5/6/03 E-mail, Ex. R to Nextel LR 56.1 Stmt.) This e-mail is sufficient to support a dispute as to whether KGA had begun preliminary sketching by its designers as of May 6, 2003 as KGA claims. (KGA LR 56.1 Stmt. ¶ 68.)

### E.    Termination of Relationship Between Nextel and KGA

During the week of May 19, 2003, Obermeyer called Garrett and informed her for the first time that Nextel had selected Chiat Day as its new advertising agency. (Nextel LR 56.1 Stmt. ¶ 103.)[19] Obermeyer also told Garrett that Chiat Day would be absorbing all of Nextel's advertising work and assuming responsibility for Nextel's packaging. (*Id.* ¶ 104.) Lausch himself was not a part of Nextel's decision to move its business from KGA to Chiat Day. (KGA LR 56.1 Stmt. ¶ 30.) The parties agree that Nextel's decision was driven by business interests and was not based on

---

[18]    KGA anticipated that it would provide package design for the new phones and accessory cards Nextel would be launching, and perhaps the literature that supports the phones. (KGA LR 56.1 Stmt. ¶ 64; Garrett Dep. at 153-55.) To accomplish this, KGA would need an explanation of what Nextel needed, including information about the shape of the container, and expected to perform its own market research in order to present Nextel with something original. (KGA LR 56.1 Stmt. ¶ 64; Garrett Dep. at 153-55.)

[19]    At the time Chiat Day became Nextel's advertising agency, Nextel ended its relationship with its former agency, Mullen. At that time, Mullen had numerous open purchase orders, however, these orders were closed down with the remaining balance put into the budget for new purchase orders to be executed with Chiat Day. (Nextel Supp. LR 56.1 Stmt. ¶ 1.)

KGA's performance. (*Id.*) In fact, Obermeyer testified that KGA always did great work for Nextel and that the companies had a "very good relationship." (*Id.* ¶¶ 38-39; Obermeyer Dep. at 21, 25.) It is also undisputed that Nextel never sent KGA a written change order pursuant to the 2003 BPO. (Nextel LR 56.1 Resp. ¶ 73.)

Initially, Nextel did not intend to give its packaging work to a new advertising agency and, although Nextel warned vendors who might be negatively affected by a change in Nextel's advertising agency, Nextel did not inform KGA that the creative packaging work on the Falcon project might be assigned to another agency. (KGA LR 56.1 Stmt. ¶ 45.) Nextel explains, however, that, during the agency review process, Chiat Day had performed much of the packaging work on the Falcon project that Nextel anticipated KGA would perform, "so it did not make sense to engage [KGA] at the time." (*Id.* ¶ 40; Obermeyer Dep. at 24-25.) With the exception of what Nextel was already paying KGA for advertising, Nextel did not pay Chiat Day for its Falcon packaging work, which resulted in savings for Nextel. (Nextel LR 56.1 Resp. ¶ 41; KGA LR 56.1 Stmt. ¶ 44.) On May 27, 2003, Garrett e-mailed Obermeyer asking him to reconsider the decision to use Chiat Day for its packaging work and to "consider leaving the packaging at KGA." (Nextel LR 56.1 Stmt. ¶ 105; 5/27/03 E-mail, Ex. S to Nextel LR 56.1 Stmt.)

### F. KGA's Invoices Under The 2003 BPO

According to Nextel, prior to May of 2003, KGA had submitted invoices totaling $19,700 pursuant to the 2003 BPO and those invoices were paid. (Nextel LR 56.1 Stmt. ¶ 121.) Although KGA insists these invoices were not related to the Falcon project, the invoices paid in 2003 refer on their face to the Purchase Order number listed on the 2003 BPO. (*See* 2003 Invoices.)

Sometime in the Spring of 2003, Garrett called Matthews to further discuss Nextel's decision to use Chiat Day. During this conversation, Matthews offered to pay KGA for any outstanding invoices. (Nextel LR 56.1 Stmt. ¶¶ 106-07.) According to Garrett, she "assessed the effort and salaries expended on Nextel's behalf" and subsequently billed Nextel $145,000 on behalf of KGA.

(KGA LR 56.1 Stmt. ¶ 69; Garret Dep. at 229-30.) This invoice, dated August 5, 2003, was purported to be for "Preliminary Falcon Packaging Research/Design." (Nextel LR 56.1 Stmt. ¶ 108.) Nextel contends the invoice was not a measure of effort and salaries expended on behalf of Nextel; it also included salaries for people "waiting" for the Falcon project and, as Garrett admitted, some amount "for the insult" of terminating the relationship with KGA. (Nextel LR 56.1 Resp ¶ 69; Nextel LR 56.1 Stmt. ¶¶ 115-17; Garrett Dep. at 229-30, 233.)

Lausch and Matthews discussed KGA's invoice and asked Garrett to supply any documentation to support the request for $145,000. (Nextel LR 56.1 Stmt. ¶¶ 109-10.) In response, on September 5, 2003, Garrett sent Lausch a letter enclosing the following documents: the Mullen PowerPoint presentation regarding Nextel's branding, a few undated internal KGA memos, printouts of some e-mail communications between Nextel and KGA, and other general materials, such as "articles and publications produced by third parties regarding color and shape" and some newspaper articles. (*Id.* ¶¶ 111-12.)

Lausch wrote to Garrett on January 2, 2004 regarding the $145,000 invoice. (KGA LR 56.1 Stmt. ¶ 31; 1/2/04 Letter, Ex. V to Nextel's LR 56.1 Stmt.) In this letter, Lausch stated that Nextel had reviewed the documentation and the body of work that KGA documented "does not provide, nor do we feel it would have provided, any valuable or actionable findings, take-aways or insights relative to the Falcon Packaging project." (Nextel LR 56.1 Stmt. ¶ 119; 1/24/04 Letter.) KGA never responded to this letter. (Nextel LR 56.1 Stmt. ¶ 120.) KGA attempts to dispute Nextel's assertion that the work provided in connection with the $145,000 invoice was of no value to Nextel by stating that KGA did provide insights, for example, related to color, that were later adopted by Nextel. (KGA LR 56.1 Resp. ¶ 113.) KGA cites to no evidence in the record to support this dispute. In any event, Garrett testified that the documents related to KGA's claimed work on the Falcon project were "internal" until they were submitted to support the $145,000 invoice, at which point Nextel was already working with Chiat Day. (Garrett Dep. at 234-35.) It is therefore far from clear that such

15

"insights" were provided to Nextel at a time at which they would have been helpful or that Nextel ever relied or considered these insights. The court concludes that any work KGA claims to have provided to Nextel related to the Falcon project was of no value to KGA.

The January 2, 2004 letter also noted that Nextel "did not pre-authorize any preliminary competitive research, design, or design research" on the Falcon project. (1/24/04 Letter.) This fact is undisputed. (Nextel LR 56.1 Stmt. ¶ 114.) Garrett acknowledged in her testimony that Nextel did not tell KGA to conduct preliminary work and that Nextel had not specifically asked KGA to conduct work such as color trending and forecasting. (Garrett Dep. at 163, 180.) Garrett also testified that market research and analysis were part of the normal course of business that KGA would ordinarily have performed, (Garrett Dep. at 163), but that testimony does not establish that Nextel authorized or requested the particular work KGA claims to have done on the Falcon project.[20]

Nextel sent a further inquiry on November 18, 2004 regarding outstanding invoices to KGA. (KGA LR 56.1 Resp. ¶ 120.) On December 14, 2004, KGA sent Nextel a letter seeking payment of the $145,000 plus interest within thirty days, and stating that KGA would pursue legal action for the full amount of the 2003 BPO if KGA did not receive such payment. (KGA LR 56.1 Stmt. ¶ 75.) On May 25, 2006, KGA sent Nextel a bill for $1 million, referencing the 2003 BPO. (*Id.* ¶ 77.)

---

[20] To support that engaging in market research was the normal course, KGA refers to one instance where KGA took the initiative to perform work that was not requested by Nextel and made a presentation to Nextel regarding bundling phones to sell to families. (KGA LR 56.1 Resp. ¶ 114.) Because KGA never billed Nextel for this research however, the example is not helpful. (Garrett Aff. ¶ 4.) KGA suggests that Nextel mischaracterizes KGA's actions in this instance so as to mislead the court into thinking that KGA was overly aggressive and would start working on the Falcon project before Nextel requested it to do so. (KGA Opp'n at 12-13.) The court does not find KGA's actions in prior projects to be relevant to whether KGA performed work that was or was not authorized in this case, and therefore will not address KGA's argument that Nextel is attempting to mislead the court any further.

**DISCUSSION**

In support of its motion for summary judgment, KGA argues that the 2003 BPO constituted a contract between KGA and Nextel, and that Nextel breached that contract when it consolidated all of its advertising work, including work Nextel expected KGA to perform under the 2003 BPO, in Chiat Day. (KGA Mem. at 2-6.) KGA contends that this breach entitles it to contract damages. (*Id.* at 6-9.) In response, Nextel admits that it was bound by the 2003 BPO, but disagrees that it breached the terms of the BPO because KGA did not submit "proper invoices" as required under the 2003 BPO, KGA did not complete any work for which it was not paid, and Nextel did not accept any work from KGA for which it has not paid. (Nextel Opp'n at 2-3.)

Nextel argues that it is entitled to summary judgment on these same grounds and that it is entitled to costs and reasonable attorneys' fees under the BPO, which specifies that "the Supplier shall pay court costs and reasonable attorneys' fees incurred by Nextel" in the event that Nextel defends any action brought by the supplier and prevails in its defense. (Nextel Mem. at 16, 21; 1/23/03 BPO.) KGA contends that Nextel is not entitled to summary judgment because, in KGA's view, Nextel repudiated the contract when it gave its packaging work to Chiat Day, and cannot complain that KGA subsequently failed to perform because Nextel's alleged repudiation made KGA's performance impossible. (KGA Opp'n at 3-6.) KGA further argues that differences between the 2003 BPO and other purchase orders shows that the 2003 BPO was a commitment to pay KGA the entire amount of the purchase order, that Nextel's understanding of its internal billing or budgeting procedures is not relevant to this dispute, and that Nextel is estopped from claiming that it denied KGA's invoice because it was not "proper" when Nextel's original stated reason for denying the invoice was that the work was not authorized and was of no value to Nextel. (*Id.* at 10-14.)

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, the court construes all facts and draws all reasonable inferences in the favor of the nonmoving party. *First Bank & Trust v. Firstar Info. Servs. Corp.*, 276 F.3d 317, 322 (7th Cir. 2001). On cross motions for summary judgment, the court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (citation and internal quotation omitted). The court need not draw every conceivable inference from the record, but only reasonable ones. *Moser v. Indiana Dept. Of Corrections*, 406 F.3d 895, 905 (7th Cir. 2005). A contract case is well-suited for summary judgment when no genuine issues of material fact exist. *See Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005) (citation omitted). Because contract interpretation is a matter of law, if a contract is not ambiguous and does not require the court to look to extrinsic evidence, there are no factual disputes to preclude summary judgment. *See Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006) (citations omitted).

## B.     Breach of Contract

### 1.     Nextel's Alleged Breach

KGA and Nextel agree that the BPO governs their relationship. (KGA Mem. at 2-5.)[21] The

---

[21]     In *American Motor Inns, Inc. v. A.W.L. Adver. Agency, Inc.*, 254 A.2d 191, 253 Md. 654 (Md. 1969),a case that KGA relies on but acknowledges does not bind this court, the Court of Appeals of Maryland found that a "budget allocation" pursuant to which an advertising agency had done substantial work was, indeed, a contract. *Id.* at 195. Because the parties do not dispute whether the 2003 BPO constitutes a valid contract, the court need not discuss *American Motor Inns* in any depth. *American Motor Inns* is not otherwise useful as the facts in that case are quite different from those before the court. In this case, KGA was not assigned and did not complete any work of value to Nextel. (*See infra* Section B.2.) In *American Motor Inns*, however, the court found that the agency was entitled to payment under the contract because the agency had done substantial work it was requested to do for two to three weeks, including on evenings, weekends,

(continued...)

court therefore turns immediately to KGA's claim that Nextel breached the terms of the 2003 BPO when it decided not to engage KGA in the Falcon project—work that Nextel it had anticipated KGA would perform under the 2003 BPO. KGA contends that the 2003 BPO does not allow Nextel "to eliminate, cancel or withdraw the order, in writing or otherwise," and that Nextel cannot rely on the change order provision because, among other reasons, Nextel did not issue a written change order as required by the terms of the BPO. (KGA Mem. at 7.) KGA does not specify what particular provision or provisions it believes that Nextel breached. From KGA's argument and Garrett's testimony, the court infers that KGA interprets the 2003 BPO as a guarantee that KGA was entitled to $1 million regardless of whether KGA submitted $1 million worth of invoices to Nextel. (KGA LR 56.1 Stmt. ¶ 59; Garret Dep. at 109, 114-15).

Nextel argues, and the court agrees, that no term or condition in the 2003 BPO guarantees a minimum payment or amount of work to KGA. (Nextel Opp'n at 2-3.) The 2003 BPO simply states that it is a "Blanket Order for 2003 Phone & Accessory Packaging" for $1,000,000.00 and authorizes specific Nextel employees to release funds against the Purchase Order. (1/23/03 BPO.) The assurance that the BPO does provide is that KGA will be paid upon the submission of "proper invoices . . . for work completed and/or Articles delivered or accepted . . ." (*See id.*)

In addition to arguing that Nextel has breached the parties' written agreement, KGA asserts that KGA and Nextel entered into an oral agreement in late 2002 under which Nextel guaranteed KGA certain work or a certain amount of payment. (KGA LR 56.1 Stmt. ¶¶ 50, 54; Nextel LR 56.1 Resp. ¶¶ 50, 54.) Nextel disputes the existence of an oral agreement, but the court need not resolve the issue; it is improper for the court to look to extrinsic evidence of an oral agreement that

[21](...continued)
and holidays. 254 A.2d at 191-92.

pre-dates the 2003 BPO.[22]  The 2003 BPO is clear that it is a fully integrated contract: the purchase order and the attached terms and conditions integrate, merge, and supersede "all prior offers, negotiations, agreements, or understandings concerning the subject matter hereof and constitutes the entire agreement between the parties."  (1/23/03 BPO.)  Delaware courts give effect to integration clauses when the contract is a formal written one between sophisticated parties; the BPO is such a contract.  *J.A. Moore Constr. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F. Supp. 982, 987 (D. Del. 1988) (citation omitted) (applying Delaware law and precluding the introduction of parol evidence of a prior oral agreement).[23]  When effect is given to an integration clause, parol evidence is not admissible to vary the terms of the agreement.  *See id.*; *Webber v. Anderson Homes, LLC*, 908 A.2d 616, 620-21 (Del. Super. Ct. 2006) ("Generally, parol evidence is inadmissible to vary or contradict a fully integrated agreement.")

While the court may look to parol evidence where a party claims fraud, accident, or mistake, as a ground for rescinding a completely integrated contract, no such exception is available in this case.  *See J.A. Moore Constr. Co.*, 688 F. Supp at 988.  Parol evidence is also admissible to construe ambiguous terms in a contract that require extrinsic proof to determine their meaning.  *See I.U. N. America, Inc. v. A.I.U. Ins. Co.*, 896 A.2d 889, 885 (Del Super. Ct. 2006).  "Contract language is not ambiguous simply because parties disagree on its meaning."  *E.I. du Pont de Nemours & Co. v. Allstate Inc. Co.*, 693 A.2d 1059, 1061 (Del. 1997).  The court here can give words in the 2003 BPO their plain and ordinary meaning, and will not impart ambiguity where there is none.  *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195-96

---

[22]      Even if it were proper for the court to look to extrinsic evidence, it remains undisputed that at the 2002 press check–the occasion at which KGA alleges an oral agreement was formed–there was no discussion of the scope of work on the Falcon project, of how much money KGA would be paid for work, or of the terms of payment.  (KGA LR 56.1 Stmt. ¶ 51; Nextel LR 56.1 Stmt. ¶ 61.)

[23]      The 2003 BPO specifies and the parties agree that Delaware law governs this dispute.  (1/23/03 BPO; Pl. Mem. at 2. )

(Del. 1992). Indeed, KGA does not point to any ambiguity in the contract relevant to whether Nextel was required by its terms to assign to KGA the work KGA expected to perform, nor does the court recognize ambiguity in any of the language in the 2003 BPO that is relevant to this determination.

The court also declines to consider parol evidence in the form of purchase orders executed between Nextel and KGA prior to 2003. KGA emphasizes the language in those earlier purchase orders that explicitly confirmed that such orders were "for accounting purposes only" and not commitments to fund the entire amount of the purchase order. (KGA Mem. at 10-11.) The absence of such language from the 2003 BPO, KGA argues, demonstrates that the 2003 BPO *did* guarantee KGA a certain amount of work or payment. (*Id.*) Because, as KGA admits, the 2003 BPO is a "fully integrated and merged contact, superseding all prior discussions or understandings," and KGA does not point to any ambiguity in the contract, the court will not look to parol evidence in the form of prior purchase orders to ascertain the purpose of the 2003 BPO. (*Id.* at 11.) The court's initial conclusion based on the plain language of the 2003 BPO thus stands; the terms of the 2003 BPO do not guarantee KGA any payment at all or any particular amount of payment, and therefore KGA's decision to consolidate its advertising work in Chiat Day and decline to assign packaging work on the Falcon project to KGA does not constitute a breach of the 2003 BPO.

Because Nextel's decision to assign packaging work in 2003 to another vendor did not constitute a breach of contract, the court need not address KGA's argument that Nextel's alleged repudiation of the contract excuses KGA's performance or that Nextel's alleged repudiation rendered KGA's performance impossible. (KGA Opp'n at 3-6.) Nextel does argue that KGA did not submit proper invoices for work completed or deliver goods accepted by Nextel and therefore did not create an obligation that Nextel pay KGA for work KGA claims to have performed on the Falcon project in 2003; Nextel does not argue, however, that KGA breached or otherwise failed to perform under the 2003 BPO. As a result, the import of KGA's anticipatory repudiation arguments are not clear to the court. In any case, the court concluded above that Nextel did not breach the

2003 BPO, and therefore finds the doctrine of anticipatory repudiation inapplicable.

KGA also argues that Nextel's "internal billing procedures/policies are of no concern [due] to the fact that it, by its own admission, failed to perform its obligations under the contract by providing KGA" with work on the Falcon project. (KGA Opp'n at 12.) As explained above, the court relies on the plain language of the 2003 BPO, not Nextel's internal billing procedures, in concluding that the BPO did not guarantee certain work or any minimum payment to KGA.

Finally, KGA argues that allowing Nextel to "eliminate/terminate/cancel KGA's involvement with [the] contract in the guise of a 'change' would make the contract illusory." (KGA Mem. at 8.) Nextel has not dressed up its decision to assign design work to another vendor as a "change" in its agreement with KGA, however. The court does not otherwise find the contract to be illusory: "An illusory contract is an agreement in which one party gives consideration that is so insignificant that an actual obligation cannot be imposed." *Woll v. U.S.*, 45 Fed. Cl. 475, 478 (Fed. Cl. 1999) (citation omitted). While it is true, as explained above, that the 2003 BPO does not guarantee KGA work on any particular project or any particular amount of work, the BPO likewise does require KGA to perform any work for Nextel. And because Nextel was obliged under the terms of the BPO to pay KGA for any work performed or accepted by Nextel, there is no absence of consideration.

KGA suggests that BPO's illusory nature is illustrated by the hypothetical scenario in which Nextel could sign up suppliers, such as KGA, and keep them from performing work for competitors but never using or paying them. By its terms, however, the BPO does not restrict KGA's ability to perform any work for any other company at any time, including competitors of Nextel. It is true that Lausch testified that he would have considered it a breach of trust if KGA had shared certain confidential Nextel documents with another telecommunications company. (KGA LR 56.1 Stmt. ¶ 18; Lausch Dep. at 77-78.) Lausch's testimony does not alter the terms of the fully integrated BPO, which contains no non-compete provision. And the court presumes KGA could have performed

work for Nextel's competitors without divulging Nextel's confidential information. The court finds no basis for a conclusion that the BPO is an illusory contract.

## 2.    Nextel's Refusal to Pay KGA Invoices

As BPO did not guarantee KGA any particular amount of work, Nextel had no obligation to pay the $1 million invoice submitted by KGA for the entire amount authorized under the BPO. The court turns, next, to KGA's claim that Nextel breached the contract by refusing to pay KGA's invoice of $145,000 for work KGA claims to have performed on the Falcon project.

Nextel claims that there is no evidence from which a reasonable factfinder could conclude that KGA has submitted "proper invoices" for work completed or for articles KGA delivered and Nextel accepted, so as to give rise to Nextel's duty to pay KGA under the 2003 BPO. (Nextel Mem. at 17.) For reasons explained earlier, the court disregards KGA's contention that Nextel's alleged repudiation of the 2003 BPO excused KGA's performance. (KGA Mem. at 3-6.) Although Nextel has been less than precise about its use of the word "proper" in this context, the court concludes Nextel had no obligation to pay the $145,000 invoice. The BPO is explicit that Nextel was to pay KGA upon KGA's "submission of proper invoices or vouchers, the prices stipulated herein for work completed and/or Articles delivered and accepted, less any proper deductions or setoffs." (1/23/03 BPO.) In giving contract terms their plain and ordinary meaning, as this court must, the court finds that this provision requires, at a minimum, that invoices must be submitted "for work completed" or for articles delivered by KGA and accepted by Nextel. (*See* 1/23/03 BPO.) *See Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1195-96. Even reading the phrase "work completed" broadly, so as to construe the phrase in KGA's favor, the plain meaning cannot possibly encompass work that is not requested and is of no value to Nextel. Indeed, such a reading would defy logic and enable KGA to decide what work it chose to complete for Nextel, complete such work without notice to Nextel, and then demand that Nextel pay for the work whether or not it had any value to Nextel.

No facts material to whether or not KGA completed work for Nextel are in dispute, nor are any facts material to whether KGA delivered and Nextel accepted "Articles" from KGA in dispute. The court therefore concludes that KGA's $145,000 invoice was not a proper one under the plain language of the BPO and finds, as a matter of law, that Nextel did not breach the terms of the 2003 BPO in refusing to pay the invoice.

While it is true that both Lausch and Obermeyer continued to believe that Nextel would work with KGA on the Falcon packaging even during late February of 2003, if not after, (Nextel LR 56.1 Resp. ¶¶ 25, 37), this expectation does not vary the court's conclusion that KGA did not in fact complete work for Nextel, nor did KGA deliver or Nextel accept any work or services from KGA. The parties do not dispute that Nextel never requested that KGA perform any work on the Falcon project. KGA admits that on February 12, 2003, Nextel informed KGA that creative requirements for the Falcon project were still "TBD." (Nextel LR 56.1 Stmt. ¶ 96.) Garrett further contacted Nextel on February 21, 2003, inquiring as to when KGA might need to start "concepting" for the Falcon project. (2/21/03 E-mail.) KGA admits that on February 24, 2003, Nextel informed KGA that Nextel personnel were still considering concepts for the Falcon project and that the creative brief was not yet prepared. (KGA LR 56.1 Stmt. ¶ 24; Nextel LR 56.1 Stmt. ¶ 98.) On March 14, 2003, Nextel contacted KGA again but still did not make an assignment for work on the Falcon project; instead, Nextel informed KGA that Nextel and Motorola had opposing views on the industrial design for the Falcon project but that the creative brief was nearly complete and Lausch hoped to share it with KGA in April. (KGA LR 56.1 Stmt. ¶ 26; Nextel LR 56.1 Stmt. ¶ 99) Bialas responded to this e-mail on March 17, 2003, stating that "Cher and [Bialas would] get the team together and begin brainstorming once [they] receive[d] the creative brief." (Nextel LR 56.1 Stmt. ¶ 100.) On May 6, 2003, at which point Nextel still had not released a creative brief to KGA on the Falcon project, Garrett inquired to Nextel as to when Nextel might release the Falcon project so that KGA could "get started." (5/6/03 E-mail.) Even Garrett, a principal and founder of KGA who communicated

24

with KGA repeatedly during 2003, admits that the work supporting the $145,000 invoice was not authorized or requested by Nextel. (Nextel LR 56.1 Stmt. ¶ 114; Garrett Dep. at 162-64, 180-81.) Specifically, Garrett testified that Nextel did not tell KGA to conduct preliminary work and that Nextel had not specifically asked KGA to conduct work such as color trending and forecasting. (Garrett Dep. at 163, 180.)

In addition to the undisputed fact that Nextel did not request any of the work supporting the $145,000 invoice, it is also undisputed that the work KGA claims to have performed was of no value to Nextel. Garrett admitted that the $145,000 invoice, in part, included salaries for people "waiting" for the Falcon project and "for the insult" of terminating the relationship with KGA, neither of which can be considered work that KGA completed for Nextel under the plain meaning of the BPO. (Nextel LR 56.1 Resp ¶ 69; Nextel LR 56.1 Stmt. ¶¶ 115-17; Garrett Dep. at 229-30, 233.) Upon receiving the "work" that KGA claimed supported the $145,000 invoice, Nextel informed KGA that such work was of no value to Nextel. (Nextel LR 56.1 Stmt. ¶ 119; 1/24/04 Letter.) Further, Garrett testified that the documents related to KGA's claimed work on the Falcon project were "internal" until they were submitted to support the $145,000 invoice, at which point Nextel was already working with Chiat Day. (Garrett Dep. at 234-35.) Based on the lack of evidence to support a dispute of material fact, the court concludes that any services or work provided to Nextel were not requested by Nextel and of no value to Nextel. KGA's invoice for $145,000 therefore is not a "proper invoice" under the plain language of the 2003 BPO and Nextel's refusal to pay the invoice is not a breach of the BPO.

In response to Nextel's arguments for summary judgment, KGA further argues that Nextel is estopped from claiming that it denied KGA's invoice because it was not "proper." According to KGA, Nextel originally explained its denial of the invoice because the work was not authorized and was of no value to Nextel, which precludes Nextel from now offering a different explanation. (KGA Opp'n at 10-14.) KGA is correct that a party cannot "mend [its] hold" after litigation has begun. *See*

*Friel v. Jones*, 206 A.2d 232, 235 (Del. Ch. 1964) (citations omitted).  In other words, "[w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he can not, after litigation has begun, change his ground, and put his conduct upon another and a different consideration."  *See id.* (internal quotations and citations omitted).  In explaining Nextel's decision to deny KGA's $145,000 invoice, Lausch stated:

> This body of work does not provide, not do we feel it would have provided, any valuable or actionable findings, take aways or insights relative to the Falcon packaging project.  Again, Nextel marketing communication did not pre-authorize any preliminary competitive research, design or design research and we were very clear throughout our communications in the first half of 2003 that the scope of our creative requirements was uncertain . . .

(1/2/04 Letter.)  This language satisfies the court that Nextel's reasoning for denying KGA's invoice has been consistent.  As explained above, Nextel now claims KGA's invoices were not proper for the very reasons articulated in Lausch's January 2, 2004 letter—the work at issue was not requested, not authorized, and of no value to Nextel.

In summary, the court has concluded that Nextel did not breach the 2003 BPO by consolidating its advertising work in Chiat Day and foregoing assigning packaging work from KGA, and that Nextel did not breach the BPO by refusing to pay KGA's $145,000 and $1 million dollar invoices.  Because no issues of fact material to either of these determinations are in dispute, summary judgment is granted in favor of Nextel.

## CONCLUSION

For the reasons stated above, Defendant Nextel Communications, Inc.'s motion for summary judgment (36) is granted and KGA's motion for summary judgment is denied.  Should Nextel wish to attempt to recover attorney's fees and costs as stated in Nextel's motion for summary judgment, Nextel is instructed to comply with Local Rule 54.3.

ENTER:

Dated: January 24, 2007

REBECCA R. PALLMEYER
United States District Judge